**FILED**

MAY - 2 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CHRISTINE A. CUMMINGS, et al.,

NO. CIV. S-99-2176 WBS DAD

        Plaintiffs,

v.                                    MEMORANDUM AND ORDER

KATHLEEN CONNELL, Controller,
State of California, et al.,

        Defendants.

----oo0oo----

        Named plaintiffs represent a class of state employees
organized in bargaining units represented by defendant California
State Employees Association, Local 1000 ("CSEA" or "the union").
Plaintiffs, who are not union members, allege that CSEA has been
improperly withholding a portion of union dues from their
paychecks without providing them with the procedural safeguards
mandated by Chicago Teachers Union v. Hudson, 475 U.S. 292
(1986).  In addition, plaintiffs claim that the indemnification
provision contained in the collective bargaining agreement
between the union and the State of California is void as against
public policy.  Both plaintiffs and defendants move for summary
judgment pursuant to Federal Rule of Civil Procedure 56.

1 *163*

I.   Procedural and Factual Background

CSEA is the exclusive representative for collective bargaining purposes of all employees in bargaining units 1, 3, 4, 11, 14, 15, 17, 20, and 21.  In March 1999, defendants Morgenstern and CSEA entered into collective bargaining agreements allowing the state employer to deduct and forward "fair share" fees from plaintiffs' ("fee payers" or "nonmembers") paychecks to CSEA.  The "fair share" purportedly represents the nonmember's share of the cost of collective bargaining.  In April and June 1999, CSEA sent two notices to nonmembers regarding the "fair share" deductions ("April notice" and "June notice").  The June notice included the "1998 Expenditure Report," which was based on an independent audit (the "Audit") of CSEA's 1998 financial records prepared by the Gibson and Company, Inc., a certified public accounting firm.

Plaintiffs filed their complaint and moved for a preliminary injunction in November 1999, claiming that the April and June notices were constitutionally inadequate under Chicago Teachers Union v. Hudson, 475 U.S. 292 (1986), because defendants did not provide an actual copy of the Audit with the notices.  On December 20, 1999, this court certified the class and partially granted plaintiffs' motion.[1]  Specifically, this court ordered

---

[1]   The court certified the following class:
All former, current, and future State of California employees employed in Bargaining Units 1, 3, 4, 11, 14, 15, 17, 20, and 21 who are, have been, or will be represented exclusively for purposes of collective bargaining by CSEA, but who are not, were not, or will not be members of CSEA, and were (after 2 March 1999), are, and/or will be nevertheless required to pay agency fees to CSEA as a condition of continued State employment.

that upon the posting of a security bond, "defendants ... shall
be enjoined from seizing agency fees from plaintiffs or any
member of the represented class until defendants have provided
such plaintiff or member of the class with a copy of the
auditor's report and the appropriate documentation."   (Memorandum
and Order filed Dec. 20, 1999, at 24:8-16).[2]

In January 2000, defendants mailed a copy of the Audit
to plaintiffs.  On January 19, 2000, plaintiffs moved for a
temporary restraining order ("TRO"), claiming, among other
things, that defendants did not change the deadline for
plaintiffs to object to the notice after sending them the Audit.
The court denied the motion for TRO in open court "on the
condition that ... defendants shall provide to the class members
an adequate notice again making reference to the audits that are
now being distributed, and allowing the plaintiffs and the
members of the class an opportunity to challenge the audits
pursuant to the discussion in Chicago Teachers Union v. Hudson."
(Transcript of Jan. 19, 2000 TRO hearing, at 28:13-20).

On January 25, 2000, the Controller's Office mailed the
"January 2000 Amended Notice" (the "amended notice") to the fee
payers.  Among other things, the amended notice referenced the
Audit and extended the period for nonunion members to challenge
the fee calculation until March 1, 2000.  The court heard

_____

(Memorandum and Order filed Dec. 20, 1999, at 23:23-27).

[2]      Agency fees are synonymous with "fair share" fees,
which represent a nonmember's pro rata share of expenses incurred
by the union in negotiating collective bargaining agreements.
See Leer v. Washington Educ. Ass'n, 172 F.R.D. 439, 443 (W.D.
Wash. 1997).

3

1  plaintiffs' January 19 motion as a preliminary injunction on
2  February 23, 2000, and denied the motion.

3         In May, CSEA mailed the "May 2000 Notice To Fee Payers"
4  ("May notice").  This notice included an "allocation audit,"
5  which verifies a union's allocation of chargeable and non-
6  chargeable expenses, and integrated the prior notices and the
7  "1998 Expenditure Report."  Plaintiffs agreed during oral
8  argument that the May notice met the requirements of Hudson.  The
9  May notice allowed fee payers to retroactively object to all
10 prior deductions, beginning with the first deduction in April
11 1999.  According to defendants, by the end of March 2001, all
12 objectors will have received a refund of the entire non-
13 chargeable portion of the 1999 "fair share" fee, with interest.

14        Plaintiffs move for summary judgment on the adequacy of
15 the April, June and January notices, as well as the validity of
16 the indemnification provision contained in the collective
17 bargaining agreements between the State of California and CSEA.
18 Defendants move for summary judgment on the grounds that (1) the
19 June and January notices are adequate as a matter of law; (2)
20 plaintiffs have not suffered any compensable harm; (3) if
21 plaintiffs have suffered compensable harm, their challenges to
22 CSEA's expenditures have no merit; (4) plaintiffs do not have
23 standing to challenge the indemnification provision; and (5) the
24 indemnification provision is valid as a matter of law.[3]

25

26        [3]    In addition, defendants Connell and Morgenstern move
   for summary judgment on the ground that the State employer has no
27 duty to review "Hudson" notices prepared by CSEA.   The court
   does not reach the merits of this issue because the court's award
28 of partial restitution leaves no injury that is redressable

4

1  II.   Discussion

2           The court must grant summary judgment to a moving party
3  "if the pleadings, depositions, answers to interrogatories, and
4  admissions on file, together with the affidavits, if any, show
5  that there is no genuine issue as to any material fact and that
6  the moving party is entitled to judgment as a matter of law."
7  Fed. R. Civ. P. 56(c).   The party adverse to a motion for summary
8  judgment may not simply deny generally the pleadings of the
9  movant; the adverse party must designate "specific facts showing
10  that there is a genuine issue for trial."   Fed. R. Civ. P. 56(e);
11  see Celotex Corp. v. Catrett, 477 U.S. 317 (1986).   Simply put,
12  "a summary judgment motion cannot be defeated by relying solely
13  on conclusory allegations unsupported by factual data."   Taylor
14  v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).   The non-moving
15  party must show more than a mere "metaphysical doubt" as to the
16  material facts.   Matsushita Elec. Indus. Co. v. Zenith Radio, 475
17  U.S. 574, 587 (1986).

18        A.   Adequacy of Notices Mailed by CSEA

19           Nonunion public employees can be compelled to pay their
20  *pro rata* share of the costs of collective bargaining, contract
21  administration, and grievance adjustment.   See Hudson, 475 U.S.
22  at 294.   However, public employees cannot be compelled to support
23  ideological causes that they oppose.   See Abood v. Detroit Bd. of
24  Educ., 431 U.S. 209, 235 (1977)   "[T]he Constitution requires
25  that such expenditures be financed from charges, dues or
26  assessments paid by employees who do not object to advancing

27

28  against defendants Connell and Morgestern.

1  those ideas ...."  Id. at 325-36.

2         In Hudson, the Supreme Court considered the procedural

3  safeguards necessary to protect nonmembers' First Amendment

4  rights.  Hudson, 475 U.S. at 302.  "The objective must be to

5  devise a way of preventing compulsory subsidization of

6  ideological activity by employees who object thereto without

7  restricting [a union's] ability to require every employee to

8  contribute to the cost of collective-bargaining activities."  Id.

9  According to the Court, the minimal procedural requirements for

10 deducting union fees from nonmembers paychecks include "an

11 adequate explanation of the basis for the fee, a reasonably

12 prompt opportunity to challenge the amount of the fee before an

13 impartial decisionmaker, and an escrow for the amounts reasonably

14 in dispute while such challenges are pending."  Id. at 310.  To

15 comply with Hudson, unions generally send a "Hudson notice" to

16 nonmembers.

17             1.  Adequacy of the April and June Notices

18         The April and June notices were not adequate under

19 Hudson because they did not adequately explain the basis for the

20 fee.  Specifically, the union failed to provide a copy of the

21 Audit in the absence of a fee payer's formal request.

22 Accordingly, plaintiffs are entitled to summary judgment with

23 respect to these two notices.

24         Hudson requires that unions provide "adequate" or

25 "sufficient" financial disclosure so that nonmember employees may

26 "gauge the propriety of the union's fee."  Hudson, 475 U.S. at

27 306.  The union must provide nonmembers an "adequate explanation

28 of the basis for the fee."  Id. at 310.  "The union need not

6

provide non-members with an exhaustive and detailed list of all
its expenditures, but adequate disclosure surely would include
the major categories of expenses, as well as verification by an
independent auditor."   Id. at 307 n.18.

The Ninth Circuit has held that an adequate explanation
of the basis of the fee includes an audit verifying that the
union "actually spent the amounts of money it claimed to have
spent on the chargeable activities."   See Knight v. Kenai
Peninsula Borough Sch. Dist., 131 F.3d 807, 813 (9th Cir. 1997);
see also Prescott v. El Dorado County, 177 F.3d 1102, 1107-08
(9th Cir. 1999) ("real independent verification of the financial
data in question" required under Hudson), vacated in part and
remanded, 528 U.S. 1111 (2000), reinstated in part and remanded,
204 F.3d 984 (9th Cir. 2000).

The Ninth Circuit has not explicitly addressed whether
an auditor's report must be provided to nonmembers without a
formal request.[4]   The Sixth Circuit, however, has addressed this
issue.   In Damiano v. Matish, 830 F.2d 1363 (6th Cir. 1987), the
Sixth Circuit held that:

> Hudson also mandates the verification of the union's
> calculations and disbursements from the fund by means
> of an independent auditor....   Moreover, the union must
> provide this information to each employee, without
> formal request and within a reasonable period of time,
> to permit the employee to evaluate the calculation of
> the fees in order to make a reasonable appraisal of the
> fees....

Id. at 1370.   The Sixth Circuit's holding serves the policy
behind Hudson, which is to ensure that nonmembers are provided

---

[4]   In Prescott, an audit was included in the notice and
thus accessibility of the audit was not an issue.

1  with sufficient information so that they can verify the

2  expenditures without the burden of making a formal request.

3          The April notice did not serve the policy behind Hudson

4  because it contained no financial disclosures.  Although the June

5  notice did contain the "1998 Expenditure Report," this report

6  does not satisfy Hudson.  The report stated:

7          The information in this report on the amount of CSEA's
         expenditures in each of these categories in 1998 is taken
8          from the independent audit of CSEA's 1998 financial records
         contained in the Financial Statements prepared by Gibson and
9          Company, Inc., a certified public accounting firm.

10  (Compl., Ex. F).  The report did not include an actual copy of

11  the audit, but offered to send a copy of the audit upon request.

12  (See id.).

13          Offering to send an audit upon request does not allow

14  plaintiffs to "gauge the propriety of the union's fee," Hudson,

15  475 U.S. at 306, nor does it tell the fee payers that the union

16  actually spent the money the way that it claimed.  See Knight,

17  131 F.3d at 813.  In order to analyze the data for themselves,

18  plaintiffs would have to either accept defendants' word that the

19  expenditures were audited, or make a formal request for the

20  audit.  Therefore, the explanation was inadequate, and plaintiffs

21  are entitled to summary judgment as to the April and June

22  notices.

23          2.  January 2000 Notices

24          Plaintiffs challenge both notices mailed in January.

25  The first notice was mailed on or about January 14, 2000, and

26  included the Audit.  It was inadequate as a matter of law because

27  it did not provide plaintiffs with a reasonable opportunity to

28  object.  The second "amended" notice was mailed on January 25,

8

1 2000, for the purpose of extending a prior deadline to allow
2 plaintiffs a reasonable opportunity to object to the Audit.  The
3 court finds that it was likewise inadequate under Hudson.

4       The amended notice of January 25 directed fee payers to
5 the June notice and the previously mailed Audit, and stated:
6 "These documents together explain why the [CSEA] has set the
7 ["fair share"] fee at 88.5% of dues." (Haagensen Decl., Ex. B,
8 Attached to CSEA's First Motion for Summary Judgment).  In
9 denying plaintiffs' second motion for preliminary injunction,
10 this court noted:

11       Although plaintiffs knew as of the date of the first hearing
        for preliminary injunction that defendants were only
12      planning to send a copy of the audit to the fee payers, they
        did not make it clear at the time of that hearing that they
13      thought defendants needed to send a new, complete notice
        with the audit.
14

15 (Memorandum and Order filed Feb. 29, 2000, at 8).  Defendants
16 have made a good faith effort, under the court's direction, to
17 correct the apparent defects in the notices.  See id.
18 (recognizing that in an attempt to reach a resolution
19 satisfactory to plaintiffs, the court itself may have led
20 defendants into the "piecemeal" approach of correcting the
21 apparent defects).  Nevertheless, the court previously
22 acknowledged that it was possible that plaintiffs may ultimately
23 succeed in establishing that the "piecemeal remedial measures"
24 were inadequate under Hudson.  See id. at 7-8.

25       The First Amendment requires that the procedure for
26 collecting fair share fees "be carefully tailored to minimize the
27 [inherent] infringement" on nonmembers' constitutional rights.
28 Hudson, 475 U.S. at 303; see id. at 307 n.20 ("the agency shop

9

1 | itself is 'a significant impingement on First Amendment rights'"
2 | (quoting <u>Ellis</u>, 466 U.S. at 455)).  This requirement is satisfied
3 | in part when nonmembers are give sufficient information from
4 | which to "gauge the propriety of the union's fee."  <u>Hudson</u>, 475
5 | U.S. at 306; <u>see</u> <u>id.</u> at 310 (also requiring a reasonably prompt
6 | opportunity to challenge the amount of the fee, and an escrow for
7 | the amounts reasonably in dispute).

8 | The court has already concluded here that <u>Hudson</u>
9 | requires the union to provide a copy of the Audit without a
10 | formal request by plaintiffs.  "The purpose of an audit is to
11 | have an independent accountant determine whether the union has
12 | actually spent the amounts of money it claimed to have spent on
13 | the chargeable activities."  <u>Knight</u>, 131 F.3d at 813.  This
14 | information must be provided "within a reasonable amount of time"
15 | to allow nonmembers to gauge the propriety of the fee.  <u>Damiano</u>,
16 | 830 F.2d 1363, 1370.

17 | In order to verify the union's expenditures for
18 | chargeable activities, plaintiffs must cross-reference the Audit
19 | provided in January with the "1998 Expenditure Report" included
20 | in the June notice, which identifies the chargeable and non-
21 | chargeable expenditures.  The court does not conclude that the
22 | law requires that non-union members in all cases be provided a
23 | single integrated notice in order to satisfy the requirements of
24 | <u>Hudson</u>.  However, the court finds that the separation of almost
25 | six months between the necessary components for explaining the
26 | basis of the fee in this case did not minimize the inherent
27 | infringement on plaintiffs' First Amendment rights.  Accordingly,
28 | the amended notice, which incorporated by reference the June

1 notice and the Audit, did not meet the requirements of <u>Hudson</u>.
2 Therefore, plaintiffs are entitled to summary judgment as to both
3 notices mailed in January of 2000.

4     B.   Compensable Harm

5       Defendants argue that plaintiffs have not suffered
6 compensable harm because the deduction of union dues from
7 nonmembers paychecks was followed by a proper <u>Hudson</u> notice in
8 May of 2000 and a new opportunity to object to prior deductions.

9       In <u>Grunwald v. San Bernardino City Unified School</u>
10 <u>District</u>, 994 F.2d 1370 (9th Cir. 1993), the Ninth Circuit
11 considered whether the use of a "deduction-escrow-refund"
12 procedure for the payment of agency fees violated the First
13 Amendment.  In that case, the union deducted full union dues from
14 the paychecks of nonmembers and placed the fees in an escrow
15 account.  Thereafter, the union mailed a <u>Hudson</u> notice to
16 nonmembers and allowed them to seek a rebate for the portion of
17 dues representing expenditures that were not germane to
18 collective bargaining.  The Ninth Circuit held that such a
19 method did not violate the First Amendment because the escrow
20 procedure ensured that money collected from nonmembers would "not
21 be used, even temporarily, for ideological purposes."  <u>Id.</u> at
22 1374; <u>see</u> <u>also</u> <u>Hudson</u>, 475 U.S. at 305-307.  Further, the court
23 emphasized that the union reasonably accommodated the nonmembers'
24 First Amendment interests by providing adequate notice as soon as
25 practicable, and a prompt refund.  <u>Grunwald</u>, 994 F.2d at 1375-76;
26 <u>see</u> <u>also</u> <u>Knight</u>, 131 F.3d at 812 ("as soon as practicable, the
27 union must send out proper notices").
28 ///

11

1           This case is materially different from Grunwald.  Here,
2   defendants began deducting fees from plaintiffs' paychecks in
3   April 1999.  However, defendants did not reduce the fees in
4   advance to reflect only those expenditures that are germane to
5   collective bargaining.[5]  Nor have defendants demonstrated that
6   nonmembers' fees were never used, even temporarily, for
7   ideological purposes.  The court finds no support in the record
8   to conclude, consistent with Grunwald, that plaintiffs' fees
9   (both objectors and non-objectors) were placed in escrow
10  beginning with the initial deductions in April 1999.  Further,
11  plaintiffs did not receive adequate notice under Hudson until May
12  of 2000, almost thirteen months after the initial deduction.

13          In contrast, the plaintiffs in Grunwald received
14  adequate notice no later than fifteen days after the initial
15  deduction.  Although the May notice is retroactive, the court
16  cannot conclude, as a matter of law, that the May notice
17  constitutes a reasonable accommodation of plaintiffs' First
18  Amendment right to a "fair, prompt and effective procedure."
19  Grunwald, 994 F.2d at 1373; see also Ellis, 466 U.S. at 440-41
20  ("By exacting and using full dues, then refunding months later
21  the [non-chargeable] portion, the union effectively obtains an
22  involuntary loan for purposes to which the employee objects.");
23  Knight, 131 F.3d at 812 (stating that "as soon as practicable,
24  union must send out proper notices").  Therefore, defendants have
25

26          [5]     The fees paid by nonmembers were reduced only to
    exclude expenditures relating to member-only benefits, such as
27  group insurance plans and entertainment discounts.  The fees were
    not reduced in advance to exclude expenditures such as charitable
28  donations and legislative advocacy.

                                    12

1   not demonstrated that plaintiffs have suffered no compensable
2   harm.  See Knight, 131 at 812 (finding that union's refund of
3   monies received is relevant to amount of damages, but does not
4   moot claims under Hudson).

5        C.  Appropriate Relief

6            Plaintiffs argue that all non-union members, both
7   objectors and non-objectors, are entitled to full restitution of
8   deductions made prior to May 2000.  In the alternative,
9   plaintiffs request that the court "adjudicate the appropriately
10  chargeable fee," and award restitution of the non-chargeable
11  deductions.  The court treats plaintiffs' alternative request as
12  a challenge to the propriety of the "fair share" fee calculated
13  in the May notice.  The court considers first whether plaintiffs
14  are entitled to full or partial restitution, and second, because
15  defendants have raised the issue on summary judgment, whether
16  there are any triable issues with respect to CSEA's determination
17  of the chargeable "fair share" fee.

18            1.  Refund of Non-Chargeable Portion of the Fee

19            Under Prescott, plaintiffs are not entitled to full
20  restitution of the deducted fees.  See Prescott, 177 F.3d at 1109
21  (finding that "demand for full restitution was punitive insofar
22  as it sought to deprive the union of fees to which it was,
23  doubtlessly, entitled").  However, plaintiffs may recover the
24  portion of the fees collected for expenditures that are not
25  "germane" to the union's collective-bargaining activity.  See
26  Abood, 431 U.S. at 238 (discussing restitution as an appropriate
27  remedy); see also Lehnert v. Ferris Faculty Ass'n, 500 U.S. 506,
28  519 (1991) ("chargeable activities must ... be 'germane' to

                                13

1  collective-bargaining").

2      In awarding partial restitution, the court is not
3  presuming dissent by all nonmembers.  See Abood, 431 U.S. at 238
4  ("dissent is not to be presumed" (quoting International Ass'n of
5  Machinists v. Street, 367 U.S. 776, 774 (1961)).  Rather, the
6  court finds that plaintiffs had no burden to object where, as
7  here, deductions were made in the absence of a reasonably prompt
8  notice that satisfied the requirements of Hudson.  See Hudson,
9  475 U.S. at 309 (finding certain requirements necessary to
10 minimize both the impingement on nonmembers' First Amendment
11 interests and their burden of objection); Airline Pilots v.
12 Miller, 523 U.S. 866, 878 (1998)("The very purpose of Hudson's
13 notice requirement is to provide employees sufficient information
14 to enable them to identify the expenditures that, in their view,
15 the union has improperly classified as germane.").  Therefore,
16 the court concludes that all class-members, not just those who
17 objected to non-germane expenditures pursuant to the May notice,
18 are entitled to a refund of the non-chargeable portion of their
19 "fair share" fee payments for the 1999 fee payer year.[6]

20      2.  Chargeable Expenditures

21      Plaintiffs contend that "all of CSEA's expenditures are
22 legally non-chargeable," and defendants have the burden of
23 demonstrating "from contemporaneous hard data" that all the
24 activities charged to fee payers were germane to collective
25 bargaining.  (Opp'n at 55:18-20, 56:18-22, 57).

26 _____

27      [6]  Defendants claim that by the end of March 2001, all
   objectors received a refund of the entire non-chargeable portion
28 of the 1999 "fair share" fee, with interest, according to the fee
   calculation provided in the May notice.

                              14

1    In <u>Airline Pilots v. Miller</u>, 523 U.S. 866 (1998), the
2   Supreme Court recognized that while "the nonunion employee has
3   the burden of raising an objection, ... the union retains the
4   burden of proof." <u>Miller</u>, 523 U.S. at 877 (quoting <u>Hudson</u>, 475
5   U.S. at 306). However, a plaintiff who is challenging the
6   calculation of an agency fee cannot "file a generally-phrased
7   complaint, then sit back and require the union to prove the
8   'germaneness' of its expenditures without a clue as to 'which of
9   its thousands of expenditures' the objectors oppose." <u>Miller</u>,
10  523 U.S. at 878. In federal court, "agency-fee challengers, like
11  all other civil litigants, must make their objections known with
12  the degree of specificity appropriate at each stage of litigation
13  ...." <u>Id.</u>

14    Pursuant to <u>Miller</u>, plaintiffs must "point to the
15  expenditures or classes of expenditures [they] find questionable"
16  with the degree of specificity appropriate on summary judgment.
17  <u>Miller</u>, 523 U.S. at 878. Plaintiffs claim that CSEA "Board of
18  Directors" meetings, and "other meetings regarding association
19  governance," were not 100% chargeable because those meetings
20  involved activities of a political nature. (Pls.' Opp'n at
21  57:10-13); (Defs.'s Ex. B at 14:3-7, Attached to Gibbons Decl.).
22  Plaintiffs further claim that a CSEA employee, Cathy Hackett,
23  improperly recorded a non-chargeable activity as chargeable to
24  fee payers on her time sheet. (Pls.' Opp'n at 57:4-9).
25  Plaintiffs have not pointed to any other expenditures that they
26
27
28

15

1  claim were improperly charged.[7]

2        Defendants argue that the expenditures challenged by
3  plaintiffs are chargeable as a matter of law.  In Lehnert, the
4  Supreme Court held that "chargeable activities must (1) be
5  'germane' to collective-bargaining activity; (2) be justified by
6  the government's vital policy interest in labor peace and
7  avoiding 'free riders'; and (3) not significantly add to the
8  burdening of free speech that is inherent in the allowance of an
9  agency or union shop."  Lehnert, 500 U.S. at 519.  The Supreme
10 Court has recognized that the test for determining whether
11 expenditures are germane to collective bargaining, and thus
12 chargeable to nonmembers, is "whether the challenged expenditures
13 are necessarily or reasonably incurred for the purpose of
14 performing the duties of an exclusive representative of the
15 employees in dealing with the employer on labor-management
16 issues."  Ellis, 466 U.S. at 448; see also Lehnert, 500 U.S. at
17 523 (extending the reasoning of Ellis to public-sector unions).
18 The Court has "never interpreted that test to require a direct
19 relationship between the expense at issue and some tangible
20 benefit to the [nonmembers'] bargaining unit."  Lehnert, 500 U.S.
21 at 522.

22       In Ellis, the Supreme Court considered whether certain
23 expenditures were germane to collective bargaining.  See 466 U.S.

24

25       [7]   Plaintiffs have previously challenged expenditures
   relating to the organizing costs of an affiliate union, the
26 "Service Employees International Union" ("SEIU").  However,
   defendants note that the May notice categorized SEIU organizing
   expenditures as non-chargeable and accordingly lowered the
27 chargeable fee.  Thus, CSEA's calculation of the "fair-share" fee
   does not include SEIU organizing expenditures, and plaintiff's
28 challenge to this expenditure is accordingly moot.

at 448-455 (considering expenses related to national union conventions, social activities, publications, and organizing efforts outside the bargaining unit). The Court had "very little trouble in holding that [nonmembers] must help defray the costs of [national] conventions." Id. at 448. The Court concluded that such events were chargeable despite the fact that the convention activities included major addresses by prominent politicians. But see id. at 459 (Powell, J., dissenting) (suggesting that the union should be required to make "reasonable estimates" of expenses fairly attributable to political activities and make "appropriate deductions from the dues of objecting employees").

According to the Court in Ellis, "if a union is to perform its statutory function [as an exclusive bargaining representative], it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." Id. at 448. The Court emphasized that unions must have a "certain flexibility" in their use of compelled funds. Id. at 456. (stating that expenses related to union conventions and publications are "well within the acceptable range" of costs reasonably incurred for collective bargaining purposes). Further, the Court found that because the costs associated with conventions "relate to the work of the union in the realm of collective bargaining," such expenses are justified by the governmental interest in overcoming the free-rider problem. Id. Allowing such expenses imposes "little additional infringement on First Amendment rights beyond that already

17

1   accepted" in the nature of the agency shop itself.  Id.

2         Like conventions, board meetings "are a standard

3   feature of union operations."  Id. at 450; see also Abood, 431

4   U.S. at 223 ("The furtherance of the common cause leaves some

5   leeway for the leadership of the group." (quoting Machinists v.

6   Street, 367 U.S. 776, 778 (1961)).  The Court in Ellis did not

7   hold that unions must allocate time spent during such meetings

8   for germane and non-germane activities.  Requiring a union to

9   apportion time spent during board meetings would remove the

10  flexibility necessary for the union's performance of its function

11  as an exclusive collective bargaining representative.  See Fell

12  v. Independent Association of Continental Pilots, 26 F. Supp. 2d

13  1272, 1280-81 (D. Colo. 1998)(finding that "the expenses

14  surrounding the Board of Director's meetings are germane.").

15  Therefore, the court finds that costs associated with board

16  meetings, and other meetings related to the governance of the

17  union as a collective bargaining representative, are germane and

18  chargeable as a matter of law.

19        Plaintiffs also claim that a CSEA employee, Cathy

20  Hackett, improperly recorded "organizing campaign" activity as

21  chargeable to fee payers on her time sheet.  In Ellis, the Court

22  held that organizing expenses associated with the recruitment of

23  employees outside the bargaining unit are not chargeable because

24  such costs are not justified by the governmental interest in

25  overcoming the free-rider problem.  See Ellis, 466 U.S. at 452.

26  Here, defendants have offered uncontroverted evidence that the

27  notation,  "organizing campaign," referred to a "contract

28  campaign" in which Cathy Hackett organized existing bargaining

18

1  unit members to discuss contract proposals and generate support
2  among unit members for CSEA's position at the bargaining table.
3  (See Hackett Decl. ¶¶ 4-5)("Among other things, the campaign
4  publicized CSEA's bargaining proposals, organized rallies in
5  support of CSEA's bargaining teams, and conducted worksite
6  meetings at which the progress of negotiations and related
7  matters were discussed."). Unlike in Ellis, the costs associated
8  with Cathy Hackett's organizing activity were necessarily and
9  reasonably incurred for CSEA's purpose of performing its duties
10  as a collective bargaining representative. Plaintiffs have not
11  offered any evidence to dispute defendants' showing. Therefore,
12  the expenditures are germane and thus, chargeable to fee-payers.

13       In sum, defendants are entitled to summary judgment on
14  plaintiffs' challenge to the propriety of the "fair share" fee.
15  The court will accordingly award partial restitution based on
16  CSEA's calculation of the non-chargeable portion of the "fair
17  share" fee. Pursuant to the May notice, CSEA's calculation of
18  non-germane expenditures is twenty-seven percent of regular
19  membership dues at the fee-payer's salary level for the 1999 fee-
20  payer year.[8] (See Defs.' Ex. C, Attached to Harrigan Decl. in
21  Support of CSEA's First Motion for Summary Judgment, filed July
22  6, 2000). Plaintiffs who did not object under the May notice
23  paid ninety-three percent of regular membership dues as their

24
25  [8]    Plaintiff has filed an evidentiary objection to
    defendants' Exhibit A, attached to the declaration of Patrick
    Haagensen in support of CSEA's Second Motion for Summary
26  Judgment. Exhibit A appears to be a copy of the Supplemental
    Award and Opinion issued in arbitration proceedings which took
27  place during June and August 2000. The court has not made any
    reference to Exhibit A in making its determination, and thus need
28  not rule on the document's admissibility.

1  "fair share" fee.  See id.  Thus, the appropriate restitution for
2  those plaintiffs who have not yet received a refund is twenty
3  percent of regular membership dues at the fee-payer's salary
4  level.

5          3.   Permanent Injunctive Relief

6          In their prayer for relief, plaintiffs seek a
7  "permanent injunction prohibiting [d]efendants from taking any
8  action to demand or collect from plaintiffs and class members, by
9  any means, so-called 'fair share fees,' and from taking any other
10 action to enforce the 'fair share fee' provisions of the
11 State/CSEA memoranda of understanding, ... until a constitutional
12 agency fee seizure approved by this Court is established and
13 operating."  (Compl. at 14:14-18).  Plaintiffs agreed during oral
14 argument that the May notice, provided for the 1999 fee payer-
15 year, satisfied the requirements of Hudson.  It is further
16 undisputed that defendants mailed a Hudson notice for the 2000
17 fee payer-year consistent with the satisfactory format of the May
18 notice.  Accordingly, a constitutional agency-fee collection
19 procedure is established and operating, and injunctive relief is
20 no longer warranted.

21     C.  Validity of Indemnification Provisions

22         Plaintiffs argue that the collective bargaining
23 agreements contain an indemnification provision that is "void as
24 against public policy" because the provision creates
25 disincentives for defendants' protection of plaintiffs'
26
27
28

                            20

constitutional rights.[9]  Defendants argue that plaintiffs do not have standing to contest the provisions and further, that the provisions do not violate public policy.

In Prescott v. County of El Dorado, 177 F.3d 1102 (9th Cir. 1999), the Ninth Circuit affirmed the district court's holding that a public employee lacked standing to challenge an indemnification provision in a collective bargaining agreement between a labor union and a public employer.  The Supreme Court vacated and remanded the Ninth Circuit's decision for consideration in light of Friends of the Earth v. Laidlaw Environmental Servs., 528 U.S. 167 (2000).[10]

In Prescott, the Ninth Circuit acknowledged that the plaintiffs suffered some injury when fees were deducted from their paychecks, but concluded that the plaintiffs could not demonstrate that the injury was fairly traceable to the indemnification provision.  See Prescott, 177 F.3d at 112.  The court characterized the plaintiffs' claim that "the provision will somehow cause the [public employer] to ignore its own

---

[9]    Each agreement contains the following indemnification provision:
> The Union agrees to indemnify, defend, and hold the State and its agents harmless against any claims made of any nature and against any suit instituted against the State arising from ... payroll deductions ....

(Pls.' Ex. A(1), Art. 4, sec. 3.2(b), Attached to Plaintiffs' Statement of Undisputed Material Facts).

[10]    The Ninth Circuit then vacated and remanded the district court's standing determination.  See Prescott, 204 F.3d 984 (reinstating its prior decision in part).  In an order filed April 17, 2001, Judge Karlton granted defendants' motion for summary judgment, finding that plaintiffs did not have standing to challenge the indemnification provision.  Prescott, No. 95-1859 LKK/JFM.

1  duties" as "rank speculation."   The court finds nothing in
2  Laidlaw that alters this conclusion.[11]

3          Plaintiffs offer no evidence of defendants' motivation
4  with respect to the indemnification clause.   Instead, plaintiffs
5  contend that "the principle of res ipsa loquitur would seem to
6  apply to [indemnification] clauses which appear only within
7  forced-unionism provisions" of collective bargaining agreements.
8  However, the existence of the provision alone cannot satisfy
9  plaintiffs' burden to show that their alleged harm is fairly
10  traceable to the indemnification provision.   See Lujan, 504 U.S.
11  at 561 ("The party invoking federal jurisdiction bears the burden
12  of establishing these [standing] elements.").

13          Further, the Ninth Circuit held that the plaintiffs'
14  claim that their injury would be redressed by a favorable
15  decision striking the indemnification provision was also based on
16  pure speculation.   Id.   ("[I]t can hardly be said that our
17  striking down of the provision would lead to some irenic world
18  wherein all fee deduction procedures were properly followed
19  because someone would finally have an incentive to assure that
20  they were.").   Laidlaw appears to alter this analysis only by
21  adding the principle that a remedy affords redress for the threat
22  of continuing violations when it "encourage[s] defendants to

23

24          [11]   The Supreme Court alluded to the causal inquiry when it
     concluded that it saw "nothing improbable" about the proposition
25  that the defendants' alleged discharge of illegal pollutants into
     a river caused the plaintiffs' to curtail their recreational use
26  of the waterway.   However, the Court made this determination in
     the context of whether the plaintiffs' suffered an injury in fact
27  that was not conjectural or hypothetical.   Accordingly, this
     court does not interpret Laidlaw to create a "nothing improbable"
28  standard for determining whether a plaintiff's injury is fairly
     traceable to the challenged conduct.

1   discontinue current violations and deter[s] them from committing
2   future ones." Laidlaw, 528 U.S. at 186.  The Supreme Court
3   acknowledged, however, that "there may be a point at which the
4   deterrent effect of a [remedy] becomes so insubstantial or so
5   remote that it cannot support ... standing." Id.

6        Plaintiffs argue that "the threat of future violations
7   would be redressed by entry of prospective declaratory and
8   injunctive relief prohibiting" enforcement of the indemnification
9   clause, and "thus forcing [defendant] Connell to execute her
10  duties absent the umbrella of indemnification provided by the
11  clause." (Opp'n at 25:1-3).  In order to prevail on this
12  argument, plaintiffs must first demonstrate that the threat of
13  future violations is an injury that is "actual or imminent, not
14  conjectural or hypothetical." Laidlaw, 528 U.S. at 180-81.

15        In Los Angeles v. Lyons, 461 U.S. 95 (1983), the
16  Supreme Court denied standing on the ground that the plaintiff
17  could not credibly allege that he faced a realistic threat of
18  future harm. Lyons, 461 U.S. at 108.  In Lyons, the plaintiff
19  sought to enjoin the use of police chokeholds because "he feared
20  he would be choked in any future encounter with the police." Id.
21  at 107, n.8.  Like in Lyons, plaintiffs' alleged injury is based
22  on their fear that defendants will commit future violations as a
23  result of the indemnification clause.  Under Lyons, "[i]t is the
24  reality of the threat of repeated injury that is relevant to the
25  standing inquiry, not the plaintiff's subjective apprehensions."
26  Id.  "The reasonableness of [plaintiffs'] fear is dependent upon
27  the likelihood of a recurrence of the allegedly unlawful
28  conduct." Id.

1     Plaintiffs have not only failed to establish any
2  previous injury that was traceable to the indemnification
3  provision, but they have also failed to show that defendants'
4  allegedly unlawful conduct, i.e. the deduction of fees without an
5  adequate explanation for the basis of the fee, will likely recur.
6  The court will not presume that defendants will act unlawfully in
7  the future.  See O'Shea, 414 U.S. at 497 (declining to assume
8  that unlawful conduct will occur as a condition to finding a real
9  and immediate threat of harm).  Plaintiffs' anticipation of
10  future harm is not "sufficiently real and immediate" to establish
11  an injury that is imminent, as opposed hypothetical.  Therefore,
12  plaintiffs cannot show an injury in fact based on the threat of
13  future harm.

14     Even if plaintiffs could establish imminent harm as a
15  result of the indemnification provision, plaintiffs cannot show
16  that injunctive relief would redress their injury.  In order to
17  find that prospective relief would deter such harm, the court
18  must accept the unreasonable premise that the provision's
19  existence somehow encourages defendants to disregard their
20  duties.  In the absence of any evidence of defendants' motivation
21  with respect to the indemnification provision, the existence of a
22  deterrent effect is no more than "rank speculation."  Therefore,
23  plaintiffs have failed to establish the elements of standing, and
24  defendants are entitled to summary judgment on this claim.

25     IT IS THEREFORE ORDERED that plaintiffs' motion for
26  summary judgment be, and the same hereby is, GRANTED with respect
27  to the April, June, and January notices.  IT IS FURTHER ORDERED
28  that defendants' motions regarding the propriety of the "fair

1  share" fee, and plaintiffs' standing to challenge the
2  indemnification provision be, and the same hereby are, GRANTED.
3  Defendant CSEA shall return to all plaintiffs who paid "fair
4  share" fees for the 1999 fee-payer year, and who have not yet
5  received an equivalent refund, twenty percent of regular
6  membership dues at the fee-payer's salary level for the 1999 fee-
7  payer year, with interest.[12]  All other relief prayed for in the
8  complaint is denied.

9        IT IS SO ORDERED.

10  DATED: May 2, 2001

12        _____
          WILLIAM B. SHUBB
13        UNITED STATES DISTRICT JUDGE

27        [12]   See supra, at 19-20 (explaining that this figure is
   based on CSEA's calculation of the non-chargeable portion of the
28  "fair share" fee under the May notice).

25

United States District Court
for the
Eastern District of California
May 2, 2001


* * CERTIFICATE OF SERVICE * *


2:99-cv-02176


Cummings

    v.

Connell

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  May 2, 2001, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


        Dylan Bradley Carp                    SH/WBS
        National Right to Work Legal Defense Foundation Inc
        8001 Braddock Road
        Suite 600
        Springfield, VA  22160

        W James Young
        PRO HAC VICE
        National Right to Work Legal Defense Foundation Inc
        8001 Braddock Road
        Suite 600
        Springfield, VA  22160

        Christopher C Foley
        Attorney General's Office of the State of California
        300 South Spring Street
        Fifth Floor
        Los Angeles, CA  90013-1204

        Warren Curtis Stracener
        California Department of Personnel Administration
        Legal Division
        1515 S Street, North Building
        Suite 400
        Sacramento, CA  95814-7243

Leslie R Lopez
Attorney General's Office of the State of California
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Harry J Gibbons Jr
California State Employees Association
1108 O Street
Suite 327
Sacramento, CA  95814

Anne Maria Giese
California State Employees Association
1108 O Street
Suite 327
Sacramento, CA  95814

Jeffrey Brian Demain
Altshuler Berzon Nussbaum Rubin and Demain
177 Post Street
Suite 300
San Francisco, CA  94108

(PT 6/25/01; JT 8/28/01 VACATED)

Jack L. Wagner, Clerk

BY: _____
       Deputy Clerk